IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 1, 2017

**IN RE NASHAY B. ET AL.**

**Appeal from the Juvenile Court for Montgomery County**
**No. MC-JV-TP-CV-16-JV-536, MC-JV-TP-CV-16-JV-537    Timothy Barnes, Judge**

_____

**No. M2017-00630-COA-R3-PT**

_____

A mother appeals the termination of her parental rights to her two children.  The juvenile court found three statutory grounds for termination of parental rights: abandonment by failure to support, abandonment by failure to provide a suitable home, and persistence of conditions.  The juvenile court also found that termination of the mother's parental rights was in the children's best interest.  We conclude that the evidence was less than clear and convincing that the mother abandoned the children by failure to support.  But the record contains clear and convincing evidence to support the other grounds for termination and that termination is in the children's best interest.  Thus, we affirm the termination of the mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed as Modified**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and ARNOLD B. GOLDIN, JJ., joined.

Gregory D. Smith, Clarksville, Tennessee, for the appellant, Natasha C.

Herbert H. Slatery III, Attorney General and Reporter, and Ellison M. Berryhill, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

# OPINION

## I.

### A. FACTUAL & PROCEDURAL HISTORY

Natasha C. ("Mother") is the mother of Nashay B., born in December 2008, and Damon B., born in July 2010. On April 24, 2013, acting on a report of lack of supervision, the Tennessee Department of Children's Services ("DCS") sent a case worker to Mother's home to investigate.

The investigation revealed that Mother and the children had moved to Tennessee from Missouri. Mother lived in a two bedroom apartment. The apartment was also the home of Mother's boyfriend and his brother. Mother, her boyfriend, and the two children all slept in one of the bedrooms. Mother, who was unemployed at the time, stated that she was unable to care for the children because of her rheumatoid arthritis and bipolar disorder. Mother also complained that, since relocating to Tennessee, she had been unable to obtain medication for her medical conditions.

Mother told the case worker that she felt like it was in her children's best interest that they be placed in state custody. DCS developed a plan to put services in the home and contacted family members, but Mother's family was unwilling to help.

The next day, DCS received a second referral concerning Mother. While seeking treatment at a medical clinic, Mother expressed her wish to commit suicide. As a result, she was transferred to a mental facility. Before she left, Mother informed the clinic that she had placed the children in the care of a neighbor whom she barely knew.

On April 29, 2013, DCS filed a petition seeking temporary protective custody of the children. The Juvenile Court of Montgomery County, Tennessee, entered a protective custody order granting temporary legal custody of the children to DCS "as of April 25, 2013." At the subsequent adjudicatory hearing, Mother waived her right to a hearing and stipulated that the children were dependent and neglected. And the juvenile court ordered that the children remain in the custody of DCS.

Mother and DCS developed three permanency plans between May 2013 and October 2015. Among other things, the first plan required Mother to make voluntary child support payments, obtain appropriate housing, and seek treatment for her medical and mental conditions. The second permanency plan added the requirement that Mother visit with the children. The third permanency plan clarified that Mother's support obligation was $25 per month.

2

On May 5, 2016, DCS filed a petition to terminate Mother's parental rights.[1] The petition alleged abandonment by failure to visit, abandonment by failure to support, abandonment by failure to provide a suitable home, and persistent conditions that prevented the children from being returned to Mother's custody.

On November 17, 2016, the juvenile court held a hearing on DCS's petition. A DCS caseworker and Mother were the only witnesses. At the time, Mother was staying at a women's shelter in Nashville, where she had been for the previous four to five months. Prior to that, she stayed at the YWCA, which had a transitional housing program. According to Mother, she could not participate in that program because she was not employed.

Mother had worked on several occasions since the removal of her children. But testimony revealed that her longest period of employment was only five months. Mother claimed her inability to maintain employment was due to her physical health. She last worked approximately two months prior to the hearing. Ultimately, she left the job due to her arthritis. Mother had applied for social security disability benefits, but despite her health issues, she was denied.

Mother admitted to being diagnosed with bipolar disorder. And she claimed to have received both medical and mental health treatment since removal of her children, a fact DCS could not verify. Mother conceded that she had not provided DCS with her records or executed a release to allow DCS access to her protected health information. The caseworker testified that Mother had not consistently followed the recommendations of her doctors.

Mother explained that she was not in active treatment as of the date of trial for her mental health issues because she had lost her job and insurance. According to her, she had three months' worth of medication that she could take until she could be seen again. Mother testified that her psychiatrist, whose name she could not initially recall, would provide her with free samples when she could not afford her prescription medication. Mother acknowledged going periods as long as two months without taking her medication.

## B. THE JUVENILE COURT'S RULING

On March 7, 2017, the trial court entered an order terminating Mother's parental rights to the children. The court found that DCS failed to prove the ground of abandonment by willful failure to visit. But the court found termination was appropriate based on the grounds of abandonment by failure to support, abandonment for failure to

---

[1] The petition also sought to terminate the parental rights of the children's father. The father's parental rights are not a subject of this appeal.

provide a suitable home, and persistence of conditions. The court also found that termination was in the children's best interest.

## II.

A parent has a fundamental right, based in both the federal and State constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. Our Legislature has identified those situations in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g) (2017).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). First, parties seeking termination of parental rights must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). Second, they must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *In re Bernard T.*, 319 S.W.3d at 596. "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

On appeal, we review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). In termination proceedings, we then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's

conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

## A. GROUNDS FOR TERMINATION OF PARENTAL RIGHTS

On appeal, Mother challenges each of the grounds found for termination of her parental rights. Specifically, Mother argues that DCS failed to prove each of the grounds by clear and convincing evidence.

### 1. Abandonment

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." Tenn. Code Ann. § 36-1-113(g)(1). The General Assembly has provided "five alternative definitions for abandonment as a ground for the termination of parental rights." *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005); *see also* Tenn. Code Ann. § 36-1-102(1)(A) (2017) (defining the term "abandonment"). The juvenile court concluded that Mother abandoned the children under both the first and the second definitions: abandonment by willful failure to support her children and abandonment by failure to provide a suitable home. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i), (ii).

### a. Willful Failure to Support

Under the first definition of abandonment, a parent's parental rights may be terminated if the parent "willful[ly] fail[ed] to visit, to support, or to make reasonable payments toward the support of the child during the four-month period preceding the filing of the petition to terminate parental rights." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013); *see also* Tenn. Code Ann. § 36-1-102(1)(A)(i). Because the petition was filed on May 5, 2016, the relevant four-month period is January 5, 2016, to May 4, 2016, the day before the petition was filed. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the day before the petition is filed is the last day in the relevant four-month period).

In order to terminate parental rights on the ground of abandonment, the court must find the abandonment to be willful. Although a parent's failure to support a child is a question of fact, "[w]hether a parent's failure to visit or support constitutes willful abandonment . . . is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d at 864.

Under this ground for termination, the financial ability, or capacity, of a parent to pay child support must be considered in determining willfulness. A parent's failure to

support a child is not willful if the parent is financially unable to do so. *In re Aaron E.*, No. M2014-00125-COA-R3-PT, 2014 WL 3844784, at *6 (Tenn. Ct. App. Aug. 4, 2014). In making a willfulness determination, the court must review a parent's means, which includes both her income and available resources for purposes of support. *See In re Adoption of Angela E.*, 402 S.W.3d at 641.

From our review of the record, DCS presented no evidence of Mother's income or available resources during the four months preceding the filing of the termination petition. Although Mother testified that she worked at TriStar Skyline in January 2016, she was never asked about her income or expenses during the relevant four-month period.

We conclude that the evidence was less than clear and convincing that Mother willfully failed to support her children. Under these facts, without at least some testimony concerning Mother's income and expenses during the relevant four-month period, the court lacked a basis to determine that Mother's failure to pay child support was willful. *See In re Lynx C.*, No. E2016-01568-COA-R3-PT, 2016 WL 7378801, at *5 (Tenn. Ct. App. Dec. 20, 2016). Thus, DCS failed to carry its burden of establishing abandonment by willful failure to support as a ground for termination.

b. Failure to Provide a Suitable Home

A child has been abandoned under the second statutory definition if the child has been removed from the home of a parent as a result of a finding that the child was dependent and neglected, and

> for a period of four (4) months following the removal, the department . . . has made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but . . . the parent . . . ha[s] made no reasonable effort[] to provide a suitable home and ha[s] demonstrated a lack of concern for the child to such a degree that it appears unlikely that [the parent] will be able to provide a suitable home for the child at an early date.

Tenn. Code Ann. § 36-1-102(1)(A)(ii). DCS's efforts to assist the parent "may be found to be reasonable if such efforts exceed the efforts of the parent . . . toward the same goal." *Id.* In evaluating those efforts, we are concerned with the time period from April 26, 2013, to August 25, 2013.

Between April and August, the court found that DCS made reasonable efforts to assist Mother in obtaining a home, such as assisting her with transportation and providing her with applications and other documents to assist her in obtaining housing. DCS also paid for a psychological assessment, parenting assessment, and any classes that Mother needed.

In contrast to DCS's efforts, the court found that Mother made "minimal efforts" to provide her children with a suitable home during this time frame. Although Mother testified to her own efforts and denied that DCS gave her any help, the court apparently credited the DCS caseworker's testimony over Mother's on this issue. *See Richards v. Liberty Mut. Ins. Co.*, 70 S.W.3d 729, 733-34 (Tenn. 2002) ("[F]indings with respect to credibility and the weight of the evidence . . . may be inferred from the manner in which the trial court resolves conflicts in the testimony and decides the case.").

When asked to review a trial court's determinations of witness credibility and the weight to be afforded particular testimony, we grant considerable deference to the trial judge who had the opportunity to observe the witnesses' demeanor and hear their in-court testimony. *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). We will not overturn a trial court's assessment of credibility on appeal absent clear and convincing evidence to the contrary. *In re Adoption of A.M.H.*, 215 S.W.3d at 809. We find no basis in this record to overturn the juvenile court's determination that DCS's efforts exceeded those of Mother's during the four-month period following the children's removal.

Beyond reasonable efforts by DCS and a lack of reasonable effort by Mother, DCS must also show Mother demonstrated a lack of concern for her children such that it appears unlikely she will be able to provide a suitable home at an early date. Tenn. Code Ann. § 36-1-102(1)(A)(ii). In evaluating the evidence on this ground, we may consider Mother's more recent behavior. *In re Joshua S.*, No. E2010-01331-COA-R3-PT, 2011 WL 2464720, at *18 (Tenn. Ct. App. June 16, 2011).

The evidence supports the juvenile court's finding that Mother was unlikely to provide a suitable home at an early date. As of the date of trial, Mother had been living at a women's shelter for four to five months. During the custodial period, she moved approximately eight different times. She was not being actively treated for her mental health issues. Nor had she sought treatment since she moved to Tennessee for the rheumatoid arthritis that she claimed prevented her from working. After reviewing this record, the juvenile court properly concluded that DCS met its burden of establishing this ground for termination by clear and convincing evidence.

2. Persistence of Conditions

The juvenile court also found termination of Mother's parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(3), a ground commonly referred to as "persistence of conditions." *See In re Audrey S.*, 182 S.W.3d at 871. The persistence of conditions ground focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *Id.* at 874. The goal is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate the

ability to provide a safe and caring environment for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds*, *In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015). The question before the court, therefore, is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

> This ground authorizes termination of parental rights when:
>
> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent . . . still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and
>
> (C) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3). Each of the statutory elements must be established by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550.

We conclude that DCS met its burden of proving all three elements of this ground for termination. DCS removed the children from Mother's home over three years before the hearing because Mother expressed suicidal thoughts and left the children in the care of a neighbor whom she barely knew. And DCS was concerned that Mother's home did not have adequate sleeping space for the children. At the time of the hearing, conditions continued to exist that prevented the children's safe return to Mother. Mother admitted that she was not actively being treated for her mental health and never sought treatment for her arthritis. Although Mother addressed her housing issues sometime in 2014, that progress was short-lived. She continued moving from home to home and at the time of trial was living at a shelter where she had resided for several months.

On these facts, there is little likelihood that the conditions that prevent the children's safe return will be remedied at an early date. The children had been in state custody for over three years. While Mother may love her children, at the time of the

8

hearing, she had not sufficiently addressed her physical and mental health and housing issues.

Continuation of the children's relationship with Mother will greatly diminish their chances of an early integration into a safe and stable home. These children had spent over three years in foster care. As of the date of trial, both children had been in their pre-adoptive home for one year. They are doing well and love their adoptive parents.

## B. BEST INTEREST OF THE CHILDREN

Although Mother did not challenge the juvenile court's best interest finding on appeal, our review must extend "to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525 (Tenn. 2016), *cert. denied sub. nom. Vanessa G. v. Tenn. Dep't of Children's Servs.*, 137 S. Ct. 44 (2016). Because "[n]ot all parental misconduct is irredeemable, . . . Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). Tennessee Code Annotated § 36-1-113(i)[2] lists nine factors that courts may consider in making a

---

[2] The statutory factors include, but are not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances, or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian

9

best interest analysis. The focus of this analysis is on what is best for the child, not what is best for the parent. *Id.* at 499. Additionally, the analysis should take into account "the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535.

As our supreme court recently explained,

> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, ___ S.W.3d ___, No. E2016-00139-SC-R11-PT, 2017 WL 4324959, at *15 (Tenn. Sept. 29, 2017).

---

from effectively providing safe and stable care and supervision for the child; or

  (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

The court first determined that Mother failed to make an adjustment of circumstance, conduct, or conditions as to make it safe for the child to be in Mother's care. *See* Tenn. Code Ann. § 36-1-113(i)(1). The evidence does not preponderate against this finding, which weighs in favor of termination. Here, even after more than three years since the children's removal, Mother remained homeless and her medical issues remained untreated. *See id.* § 36-1-113(i)(7). Although Mother at some point was compliant with receiving treatment for her health issues and obtaining suitable housing, her efforts were short-lived. As a result, Mother failed to effect a lasting adjustment after reasonable efforts by DCS for such a duration of time that lasting adjustment does not reasonably appear possible. *See id.* § 36-1-113(i)(2).

The court also found that Mother had not consistently visited with the children. *See id.* § 36-1-113(i)(3). The evidence does not preponderate against this finding, which also weighs in favor of termination. The record shows that Mother only sporadically visited with the children. Over the course of the four-month period preceding the filing of the petition, she only visited twice. Although Mother partly blamed transportation issues for her failure to visit the children, Mother admitted that she did not consistently maintain contact with DCS and did not ask DCS for help with transportation. And Mother admitted that she would often forget about the scheduled visits.

As a result of her sporadic visits, Mother had not established a meaningful relationship with the children. *See id.* § 36-1-113(i)(4). Here, Mother could not even remember whether her prior visits with the children went well. According to the DCS caseworker, the children had recently stopped asking about Mother.

On the other hand, the court found that changing caregivers would cause the children to regress. *See id.* § 36-1-113(i)(5). This factor also weighs in favor of termination. Here, the children were bonded to the foster parents. They had been in their current pre-adoptive foster home for over one year. The children love the foster parents, and Damon wants the foster parents to adopt him. The children's grades and their behavior have improved.

The court also found that Mother's mental and emotional status would be detrimental to the children and prevent her from effectively providing safe and stable care and supervision for the children. *See id.* § 36-1-113(i)(8). The record supports this finding, which weighs in favor of termination. Mother has had a history of mental health issues. When the children first came into state custody, Mother expressed a desire to kill herself and imprudently placed the children in the care of someone she barely knew. During the custodial period, Mother did not consistently take her medication. As of the date of trial, Mother was not being actively treated for her mental health.

Additionally, the court found that Mother had not paid child support. *See id.* § 36-1-113(i)(9). This finding is likewise supported by the record and weighs in favor of

termination. The court credited the DCS caseworker's testimony that Mother had not paid any child support at all. Conversely, there was proof that the foster parents have provided for all of the children's needs.

Not all factors, however, weigh clearly in favor of termination. DCS did not present any evidence that Mother or anyone in her home has ever "shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward" the children. *See id.* § 36-1-113(i)(6).

From the totality of the circumstances, we conclude that clear and convincing evidence supports the juvenile court's conclusion that termination of Mother's parental rights was in the children's best interest.

### III.

The record contains clear and convincing evidence to support terminating Mother's parental rights on two of the three grounds relied upon by the juvenile court: abandonment by failure to provide a suitable home and persistence of conditions. The record also contains clear and convincing evidence that termination is in the children's best interest. Thus, we affirm the judgment of the juvenile court terminating the parental rights of Mother as modified by this opinion.

_____
W. NEAL MCBRAYER, JUDGE